I appreciate the opportunity to come and discuss with you the forfeiture by the United States government of nine pieces of the real property. A forfeiture that we contend is an excessive fine and violates the Eighth Amendment to the United States Constitution. The relief we seek is for the court to set aside those forfeitures where the fines are excessive and to return those properties for the monetary equivalent to bridge it. The basis for our case is that the fine is disproportionate to her culpability. The forfeiture is excessive because of the sentencing manipulation that was orchestrated in this case by the government and is excessive because of her diminished capacity which she was suffering at the time of this sting operation commenced in 1997. The reason for our forfeiture laws is to take the profit out of crime. It's not to provide the government with a tool to make a profit or to be overcompensated by implementing the drug laws or the laundering laws of our country. What I submit here is that what started out as a sting operation may be focused on Bridget eventually became focused on her nine pieces of property situated here in Honolulu. Sting operations, we're not here to ask the court to say that sting operations are bad. We're not here to say that there's blanket rules that should be applied or that we should try to curtail the government's ability to investigate crimes or to tell them when to have to file indictments. But what we do have in sting operations on the one hand is they're legitimate and they serve a good purpose. On the other hand, the far right of the spectrum, they can't continue indefinitely, they cannot be increased disproportionately, and they can't lose the objective of legitimate law enforcement. And that, I believe, is what happened here. We had a sting operation that ended up in a sentencing manipulation situation. The operation lost its reasonable and its legitimate law enforcement objectives and it served the practical purpose of ratcheting up Ms. Riddell's sentence in terms of time and forfeiture. I'm not here to say that this is all caused by the government. Ms. Riddell broke the law and she was convicted. And some of her property deserves to be forfeited, but not all of it. So what's your suggestion on that? Well, my suggestion is that we have this... What do you think is a reasonable forfeiture under the facts of this case? The first, what I refer to as... Half the property or... I'm sorry? Half the property, a third of the property. Whatever I can get. We have basically three transactions that occur here. We know that Ms. Riddell's not a launderer and when she started out, she's 61 years old, working since she was 15. And I will get to it. I will answer it. No, that's fine. She wanted to sell her properties and that's how the government worked. She was predisposed to sell her properties and they set everything up regarding that. In answer to your question, we have three sets of property. We have 1502, which is the first transaction. We have the apartment house, which is the second transaction. Then we have seven other miscellaneous properties, which are the third transaction. One is definitely, there's no objection, there's no offensive conduct there. That goes to the government legitimately. The second parcel, I'd like to say about 25%, but the last transaction is totally excessive. And the reason it is is because by the time they got to the third transaction, there was no other legitimate law enforcement motive, no reason to get her into this position or to have her launder additional funds. The government made it, like I said, an entirely pristine operation. The only person that didn't know what was really going on was Bridget Riddell and the bank tellers that converted the cash into the cashier checks. The first transaction or the first agreed upon purchase by the government was one property that was worth $165,000. The government in June made $55,000 available for the down payment. The government agent involved came into Mrs. Riddell's life, originally prostitutes, in March and that was in June of 97. In March of 98, they became drug dealers and they indicated to her that they were now selling drugs. On June 16, they said this $55,000 is drug proceeds and we're going to use this and drug proceeds to pay for the property. We all know why they did that. We all know why the prostitutes became drug dealers. So on the 18th, Mr. Riddell goes into the bank with the operatives, converts them under the cashier's check, brings it out and gives it to the operatives. They go home. There's continued discussions from the 18th of June until August 14 of 98 regarding Mrs. Riddell's additional property. She wanted to sell all the properties. She wanted to get out of the business and she eagerly discussed the sale of the properties. The government offered top dollar for the time, but the government had already set the hook. We want to buy your properties and she bit. Now she should have said, I don't want to launder your money. I should have laundered your money, but she's 61 years old. She's been working since she's 15 and she wants to sell the properties. She doesn't really care that the proceeds will grow. So we go through the first transaction, then we come into the second transaction, which is in August of that year. She goes into the bank and launders $320,000 in cash. Again, the operatives are there, the bank converts the funds in the cashier's check. The only difference between the June transaction and the August conversion of cash in the cashier's check is now the government has set up an escrow company to facilitate their acquisition of her real property. The money's converted, the $320,000 is converted in the cashier's check. They go out, they go down to the independent escrow company and they deposit the $55,000 cashier's check and there's the $320,000 cashier's check. We're all right. I'm in bad shape. The government's all right. When you get into the transaction that occurs in September, that's when you really have to look at the conduct of the government to see what their legitimate law enforcement objective was. All of the transactions previous to the September transaction were discussed fully in great detail on tape as to what Ms. Riddell is going to do and she does it. It goes down precisely the way it's planned in June. It goes down precisely the way it's planned in August. And from the August to September date, they discuss the government objectives, discuss with Ms. Riddell buying the rest of the properties that we're discussing today, the seven additional properties. So what the government does then is they come to Ms. Riddell and say we want a package deal and we want to close the escrow on September 30th. So we want to complete everything and move forward. Otherwise, if we can't complete it all, we're not interested in completing anything. The government takes $100,000 that they converted into cash and they apply $100,000, $202,000 to each one of six pieces of property and they're balanced $84,000, excuse me, $86,000 to the apartment house which was property transaction number two. What was the purpose, I ask, for doing that transaction? The practical purpose was to ratchet up her sentence. The government was able to argue that she had her sentencing, that she laundered or had the intent to launder $2.6 million, which was the total aggregate purchase price or sales price for all the properties. It was also able to, instead of just forfeiting two properties, to go back and to forfeit, which was the legitimate law enforcement objective that was accomplished between the second transaction and the third transaction. In the third transaction, excuse me, $12,000 was applied to six pieces of property and balance? No, no. In the third transaction, we have a check for $100,000. Cash for $100,000 is included in that check. The government parcels out $2,000 for seven properties as earnest money, down payment, and then $86,000 goes back to the apartment house, which was transaction number two. So what the government does is they come out and they say, well, we want all the properties we can get. We need to close by September the 30th. And the only thing that closes in this situation, obviously, is on the 2nd of October when she's arrested, and the handcuffs close. But I submit that at that point in time, there had been nothing new provided by the investigation. And by that point in time, I'm talking about September the 15th. There was nothing new that was added by this further laundering or encumbering the additional properties. If they hadn't put down the $2,000 for each of those seven pieces of property, would they be unable to forfeit them even though they had a deal for it, so they might get put up with that $2,000? Well, that's an interesting question. I'd say they could not. They could not forfeit it because the properties themselves were the instrumentality to use to launder the money. They have to have the majority of the properties, but it's the parceling of the money. I mean, the government could have done a lot of things. They could have come on. There were seven properties that they still had in their sights that they had to get by the arrest date. They could have done one. Mr. Dell all along was saying, why don't you close on one piece of property? Why do we have to do all nine? Okay. Well, your time is more than expired. Thank you. Good morning, Judge Reinhart, Judge Thomas, Judge Clifton. May it please the Court, my name is Rachel Moriyama, Assistant United States Attorney representing the United States. Before I start my argument, I'd like to thank the members of the panel and opposing counsel for kindly postponing this argument today. You sound as if you've recovered. I'm getting there, Judge. And I appreciate that the two days really helped. And I apologize for the inconvenience. Not at all. The defense's arguments with regard to sentencing manipulation and or entrapment are simply not supported by the facts and the record. The district court's fact-bound decision rejecting those claims were supported by the record. And the court's factual findings were not clearly erroneous and therefore should be affirmed. The defendant's claim of sentencing manipulation is basically a bald allegation that this investigation went on too long and that it should have stopped after the sale of the first property. This type of claim has already been rejected by this court. In the Baker case, where the court said that we declined to adopt a rule that in effect would find sentencing manipulation whenever the government, even though it has enough evidence to indict it, opts instead to wait in favor of continuing its investigation. Such a rule would unnecessarily and unfairly restrict the discretion and judgment of investigators and prosecutors. The burden of proof is on the defendant to prove these claims. And the record contains no showing, no evidence of any extraordinary government misconduct, any improper inducement, or that the government had improperly enlarged the scope or scale of this crime. The factual allegations asserted by the defense in their opening brief have no citations to the record. They're simply not true and not supported by the record. To the contrary, the record shows that this defendant was a willing and active participant in all of the criminal activities for which she was convicted. She was sufficiently sophisticated to know about money laundering and on two occasions actually talked to the undercover officer about how worried she was that the banks or the IRS would think she was money laundering unless they opened an escrow account, signed contracts for the sale of these properties so that she would then have a story, a cover story, to give if anyone questioned why she was depositing such large amounts of currency. The record also shows that she was the one that was personally responsible for expanding the scope and scale of the money laundering offenses. Here, she was the one who first raised the issue of selling her properties to the undercover officer. Over the span of several months. The defendant came up with this idea of how to structure the sales to protect the undercover officer who was, of course, had large amounts of currency that were tainted, whether it was because it was prostitution proceeds or drug proceeds. She was the one who talked to the undercover officer about the possibility of selling properties under agreements of sale where financial institutions wouldn't have to be involved. She was the one who explained what an escrow company would do. The undercover officer represented herself as a relatively unsophisticated person who didn't understand the process and so it was the defendant that came up with the scheme. Refresh me on how they agreed on the price. The defendant set all of the prices. She's the one who came up with the price list. There was a little bit of negotiation with regard to the Nahua Street property. That's the 14 room apartment building. Initially, the defendant wanted $1.9 million to sell that property. I think the undercover officer attempted to counter at 1.2 and then the price was set somewhere in between. But basically the defendant, and she testified herself, that the prices were set based on what she paid for when she purchased the property in the 1980s and early The other thing about this case is that you have a valuation for sentencing purposes of $2.6 million of the property and then the valuation of the property itself for fine purposes which is more than half of 3.75 or something. I guess looking at the record itself it doesn't seem as though we have a very good handle on what the true fair market value of the property is. I think that those two valuations serve two different purposes. Yes, they do, but I understand that. But also it does seem somewhat contradictory in the sense of saying, well, we're going to engage in some negotiations. We're going to agree on an arm's length transaction of $2.6 million. When it comes down to determining forfeiture, we're going to evaluate it at the tax settlement rates. The negotiations between the defendant and the undercover officer were not arm's length transactions. I think the defendant knew that she had the undercover officer over a barrel because this person was a prostitute and a purported drug dealer who was unable to use bank accounts, had the need to clean her illegal proceeds. And so the defendant took advantage of that and demanded those inflated prices. Is there a bit of speculation? I'm sorry? We don't know how she set her prices, except that that's what she paid for. But she did admit that they were inflated prices. But basically you have to assume that the real estate market had dropped 50% in order to get at the conclusion that these properties are worth $1.375. That's true, Your Honor. Hawaii had experienced a huge bubble when the Japanese were investing in the islands. And when that investment stopped, the market did drop significantly. But it was the defendant that came up with the idea of selling all of these properties in the package deal. It wasn't the undercover officer. I think that this case is similar to the Edgemony case. That was the case relating to a sting operation involving stolen credit cards where the undercover officer was selling credit cards and on three occasions may have sold only a few cards that had limited credit amounts. But with regard to the fourth transaction, suddenly 40 stolen credit cards were used and the court did not find that that was sentencing manipulation or entrapment because the undercover officer just told, gave the defendant in that case the option to not accept all 40 and really the deal was only for 10. The court there found that it was the defendant who ratcheted up the scope of the criminal activity in that case. I take your point. The odd thing is if we assume that the $1.3 million or $1.375 million is the true fair market value, what we have then is the government agreeing to pay twice the market price to someone who is 61 years old. One might argue that that is inflating the value of the properties worth $0.05. If we're saying this isn't a fair market transaction, we end with the government paying way over fair market value. It adds another element to the case. But again in this case it wasn't the government that set that price. This is not like a drug case where the government offers to purchase drugs at a deflated price just to get the defendant to buy more, a greater quantity than he or she would. And in fact in this case I think the trial court properly found that the fair market value of the properties had to be found at the time that he was making his inquiry into the excessive fines issue. And even between the time that we indicted this case and then had the Eighth Amendment argument, the value of those properties fell. And that's why at the trial level we gave the judge I think six or seven years of tax assessed values so that he could see the trends. And that I think too is a factual finding by the trial judge. That's not clearly a release. I think he followed the case law and relied on the best evidence that he had. With regard to the Eighth Amendment argument, I think that... Now Cass, if you could try to make that in one or two minutes at most because the time is up. I will, Your Honor. I just want to make the point that this case is not Bajikajian, it's not Thurman Street. The defendant's criminal activity was very serious. She was an active participant and was really the which was present in the Bajikajian and the Thurman case. This case, this forfeiture is not even as harsh as the forfeiture in the Ahmaud case where the court upheld forfeitures that were 17 and 20 times the sentencing guideline fines that were applicable in this case. Here we are only dealing with a forfeiture that is roughly equal to the maximum statutory fine and 12 times the sentencing guideline fine. Thank you. Thank you. The government opted it all along, said there's plenty of money here. Money's no object, it's just one of the properties. There was a lot of negotiation. It started in June of 97 and it concluded in September of 98, number one. The case cited by the people is distinguishable. Cited as to the sentencing information is distinguishable from the rest of the community because that court in that case specifically found that there was a legitimate law enforcement objective and it was obtained in that case. They found other co-conspirators, other sources and avenues to get rid of these credit cards. So that's distinguishable. And finally, my client's predisposition to sell the property really is irrelevant when you come to the end and the analysis of the sentencing manipulation. It's the conduct and the motive of the government. If the conduct and the motive of the government is to ratchet up the sentencing, to ratchet up the forfeitures and there's no legitimate law enforcement objective, then you've got sentencing enhancement. And I submit that's what we have here, sentencing manipulation. Thank you. Thank you. These charges will be submitted. The court will stand in recess for the day. Thank you.
judges: Judges Reinhardt, Thomas, Clifton